IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF a Samsung Tablet; FedEx USB storage device. | MJ-23- *43*-M-KLD |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jason D. Grende, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41.  This affidavit supports applications for search and seizure of the following:

- One Samsung Tablet with grey cover (Device 1); and,

- One FedEx USB storage device with attached key (Device 2).

Device 1, and Device 2 will together be referred to as "Devices."  Devices 1 and 2 were seized from a white 2022 Toyota Kia during the execution of a search warrant by the Flathead County Sheriff's Office (FCSO).  This applied for warrant would authorize the forensic examination of the Devices identified in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation and am currently assigned to the Kalispell Resident Agency in Kalispell, Montana. I have been employed as an Agent for twenty years. In that time, I have been assigned as the primary case Agent in the investigation of complex federal crimes, including, but not limited to, financial fraud, public corruption, violent crimes, terrorism, and the illicit use of computers and the Internet. I have obtained and executed federal search and arrest warrants on numerous occasions, including Internet-based searches, and have testified in federal court on several occasions regarding the results of these searches.

3.     The facts set forth in this affidavit are based on the following: my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of witnesses; my review of records related to this investigation; communications with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

4.     Through my experience and training I am aware that perpetrators of financial fraud schemes utilize electronic devices to communicate with co-

conspirators and past and current victims of their schemes. The perpetrators of these financial fraud schemes also utilize electronic messages, such as email and text messages, to promote their schemes in an effort to entice and attract new victims to the scheme.

5.      Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that the Devices contain evidence of violations of 18 U.S.C. §§ 1343, 1349 (wire fraud and conspiracy to commit wire fraud) and 18 U.S.C. § 2314 (interstate transportation of stolen property).

## **PROBABLE CAUSE**

6.      The information below is presented to show that Sukhdev Vaid and Eddly Joseph traveled from California and arrived in Montana on February 25, 2023.  Joseph and Vaid were then involved in the theft of $150,000 from a 73-year-old victim named Jane Doe.[1]   Jane was influenced by other subjects she was communicating with by telephone and over the Internet to part with her money, in violation of 18 U.S.C. §§  1343, 1349, and 2314, and evidence of this criminal activity is likely to be found within the Devices.   Evidence corroborating these

---

[1] The name and identity of the victim is known to the agent, but the name is replaced with Jane Doe to protect the privacy of the victim.

allegations includes witness interviews, surveillance video, and search warrants executed on a vehicle driven by Vaid, and a search warrant executed on a motel room rented by Joseph.

7.     On February 27, 2023, the Kalispell FBI office received a call from Connie Tuman, Vice President at Glacier Bank, to report a concern she had with Glacier Bank customer Jane Doe, a 73-year-old, single woman.  Tuman explained she was contacted by Jill Parish, the Glacier Bank Branch Manager in Bigfork, Montana.  Jane met with the Parrish at the Bigfork office, requesting to withdraw $50,000 cash.  Jane commented to Parrish that her (Jane's) brother from Florida was coming to pick up the cash.  Upon reviewing Jane's account activity, Tuman confirmed she withdrew a total of $150,000 between February 23 and February 24, 2023, at different Glacier Bank locations.

8.     Tuman responded to the concerns by contacting Jane on her cellular telephone and explained to Jane she was calling about the $50,000 cash withdrawal request.  Jane stated her brother was working with a contractor in Florida to either buy property or to "build something," and this contractor would only accept cash.

9.     While Tuman continued to ask questions, Jane's landline rang.  Jane picked up the landline while still on the cellular phone with Tuman and began to have a separate conversation which was audible to Tuman.  Tuman heard a man on

the other end of the landline with a distinct Eastern Indian accent.  Tuman heard

the following dialogue:

> Jane: "Jack sorry I had to hang up."

> Jack:  "Have they created the online access?"

> Jane: "I am on the phone with the bank now."

> Jack: "What are you doing with them?  Let me know what they are talking to

> you about."

Tuman at that point realized Jane was caught in a scam.

10.     On February 27, 2023, after receiving the information from Glacier

Bank, I interviewed Jane at her home located outside of Bigfork, Montana.  Jane

stated sometime in January 2023, she received a message on her computer

instructing her to contact "Microsoft Support."  The message then provided her a

phone number to call.  Jane called the number and spoke to Jack Chen.  Jack told

Jane he worked in Redmond, Washington, for the Microsoft Identity Fraud

Department.  Jack told Jane her laptop computer had been "hacked."  To fix the

problem, Jack instructed Jane to allow him remote access to her computer, which

she did.  Jack and Jane continued to talk for the next few weeks.  During that time,

Jack instructed Jane to access her bank accounts online while he was watching so

he could verify to her that her accounts had not been "hacked."  Jack and his

"support team" had full remote access to Jane's computer.  Jack told Jane they

were continuing to identify "hackers" who had access to her computer. Jack sent Jane reports claiming to show identified IP addresses and the locations of alleged "hackers" accessing her computer. Jack told Jane some of the "hackers" lived near Jane and told her to not trust anyone, including friends, family, and bank employees. When Jane asked Jack about speaking with her financial advisor, Jesse Mann at Edward Jones, Jack told her, "Absolutely not."

11.     During the discussions, Jack mixed in personal questions about Jane's life and home along with her personal finances and where money was located. Jane told Jack she had a checking account at Glacier Bank and an investment account with Edward Jones. Jack informed Jane that her money was not safe because the "hackers" had online access to her accounts.

12.     Jack virtually introduced Jane to "Nick Brown," who allegedly worked for Edward Jones's fraud department. Jack told Jane he would set up a secure line so no one could hear her talking with Nick.   Jane spoke with Nick about keeping her Edward Jones account safe and secure.   Nick then transferred Jane through a secure line to "Natalie Gibson." Natalie advised Jane she worked for the Federal Reserve and would provide Jane with a new Social Security number. Natalie then told Jane the best option to protect her money was to provide cash to "Federal Reserve Runners," who would transport her money to a regional Federal Reserve office. They would then deposit the money into a new account in

6

her name for "safekeeping." Jack, Nick, and Natalie convinced Jane to remove
$350,000 from her Edward Jones account, place $150,000 in her Glacier Bank
account, open a new account at Wells Fargo Bank, and place the remaining
$150,000 into the Wells Fargo account. Jack also told Jane once the Federal
Reserve received her money, it would be placed into an account in her name until
all the "hackers" from her computer were removed. At that point, Jane's money
would be returned to her.

13.     On Saturday, February 25, 2023, after Jane withdrew $150,000 cash
from her Glacier Bank account, Jack instructed her to show the cash to him once
she returned home using her laptop computer's camera. Jack instructed Jane to
place the cash in a box, seal it up with tape, wrap the box with wrapping paper, and
place it in a shopping bag.

14.     Jack gave Jane a description of an unknown male (hereinafter referred
to as "Richard"), who she would meet to pick up her cash. Richard would be
wearing a black jacket, with a red sweatshirt underneath, and glasses. Jane was
instructed to meet Richard in the parking lot of the Echo Lake Café near her
home. Jack told Jane that Richard would take her cash to the Federal Reserve
where it would be protected.

15.     On February 25, 2023, at around 4:45 p.m., Jane drove her vehicle (a
blue Toyota Rav 4) to the Echo Lake Café and parked in the front parking lot.

7

Shortly thereafter a black male wearing a black jacket, a red hooded sweatshirt, and blue jeans approached Jane's vehicle. The male stated his name was Richard and provided a password of "0000." After Jane provided Richard with the box containing her money, Richard walked away from her vehicle and headed down Swan River Road. Feeling strange about what had just occurred, Jane followed Richard in her vehicle and observed that Richard was on the phone with someone. When Jack telephonically instructed Jane not to follow Richard, Jane turned around and went home.

16.     After this initial interview with Jane, I contacted Amy Herman, owner of the Echo Lake Café. Herman provided a copy of the café's surveillance video around the time Jane met with Richard. The surveillance video confirmed the information Jane provided to me about meeting with the black male.

17.     On March 1, 2023, FBI Special Agent Jacob Furda received surveillance video from JJ Lamb, Principal of Swan River School, located across Echo Lake Road to the east of the Echo Lake Café on the north side of Highway 83. Upon reviewing the school's video surveillance footage for the afternoon of Saturday, February 25, 2023, Special Agent Furda observed a dark gray Chrysler minivan pulling into the school's parking lot to the east of the Echo Lake Café at approximately 4:19 p.m. The vehicle was later seen on the security footage dropping off the unknown black male who met with, and collected the money

8

from, Jane. The unknown male walked to the back (east side) of the town hall building located across Highway 83 from the school. The video shows the unknown male hiding behind the building. Once Jane arrived, the unknown male walked out from behind the building, crossed Highway 83 and headed toward Jane's vehicle.

18.    On March 1, 2023, Jane received a call from Jack. During the call Jack placed a file on Jane's computer showing a "receipt" for the deposit of Jane's $150,000 into an account in her name at the Federal Reserve. Jack also provided a document that stated, "Government Item," which listed the name Natalie Gibson as an employee of the Federal Reserve. The "Cash Collector" on the document was "Richard M. Willey." Jack also provided a document that showed "Current Connections=10." Jack told her "10" meant the number of hackers on her laptop that he still needed to clean up. The last time Jack provided Jane with a similar document, it showed "Current Connections=30." Jack told Jane he was making progress. The document also showed IP addresses that Jack explained identified "hackers" accessing her laptop.

19.    On Thursday, March 2, 2023, at approximately 8:25 a.m., Jane received another call from Jack, calling from telephone number 1-800-931-8649. Jane conducted a consensual recording of the telephone call with Jack, which I reviewed. During the call, Jack asked Jane to check access to all of her online

banking accounts.  Jack told Jane he received an email from a person working on the case who needs to know if Jane can access her accounts.  Jane indicated to Jack she still has $50,000 in her Glacier Bank account and also has money in her Wells Fargo account.  Jane expressed concern about her money to Jack and asked, "I am wondering if I should try and get some more and um get it to Richard again?"  Jack identified "Mr. Brown" as the only person who could answer that question.

20.     On Friday, March 3, 2023, at approximately 8:15 a.m., Jane received a telephone call from Jack, calling from telephone number 1-800-931-8649.  Jane conducted another consensual recording of the telephone call with Jack, which I reviewed.  Jack informed Jane he received an email from Mr. Brown indicating the amount of money Jane needs to supply is between $40,000-$50,000.  Jack further instructed Jane to visit multiple Wells Fargo branches to obtain this amount.  Jack coached Jane to "carry the attitude of a rich woman."  Jack asked her what she is going to say if they ask what she is doing with the money.  Jane told Jack that she will use the same story that she has her eye on some property in Florida.  Jack told her to say my brother is coming next week to get the cash.

21.     During the afternoon hours of March 3, 2023, FBI Special Agent Shaun Schrader and I met Jane at Glacier Bank in Kalispell, Montana.  In the presence of Tuman and other Glacier Bank employees, Jane withdrew $50,000

cash from her account.  Jane provided the cash to me and Special Agent Schrader, and we transported the money back to Jane's residence.

22.     On March 3, 2023, at approximately 4:45 p.m., Jane placed the money on her coffee table and showed the money to Jack through her computer camera. Jack communicated with Jane through the notepad application on her computer and provided the same instructions as before—place the cash in a box, tape up the box, and wrap the box in gift wrap.  Jack informed Jane he would contact her on March 4, 2023, at approximately 10:00 a.m. to confirm a time and place when and where she would meet a runner who would pick up the cash.  Jack thought the meeting would take place sometime between 11:00 a.m. and 3:00 p.m. the following day.

23.     On March 4, 2023, Jack instructed Jane to meet at the Swan River School parking lot to give the runner, identified as "William," $50,000 cash. Multiple FBI Agents, along with Flathead County Sheriff's Office, conducted a surveillance operation to attempt to locate the black male and other unknown subjects involved in the fraud.  Jane had numerous phone conversations with Jack, who asked numerous questions, including what Jane was wearing.   Jane replied, "[T]hick winter jacket with a fur trimmed hood and blue jeans" and also told Jack her license plate tag was "CLZ 4016."

24.     During the conversations with Jane, Jack stated Mr. Brown was concerned about them meeting Jane at the Swan River School and stated they

11

wanted to change the meet location to the parking lot of Harvest Foods in Bigfork,

Montana.  With Jack requesting to change the meeting location, FCSO Detectives

Shields and Mulcahy drove to the Harvest Foods location in an unmarked vehicle.

Detective Shields observed a black male walking into Harvest Foods.  Detective

Shields entered the store, and while at the check-out register, took the below

picture of the black male:



25.    At approximately 1:20 p.m., FBI Task Force Officer (TFO) Joseph

Chevalier observed a white Kia sedan circle the initial proposed meeting spot.

This vehicle appeared to be a rental vehicle and was occupied by a lone male.  This

vehicle left the area and returned moments later to park at the Echo Lake Café.

The vehicle moved multiple times in the same parking lot, appearing to reposition

to get a better view of Swan River School.  TFO Chevalier obtained the license

plate (MT 7-59115D) and ran checks through law enforcement systems.  The

return for the license plate listed the owner as ROVAR LLC, which is owned by Budget Car Rental. TFO Chevalier contacted the Budget Car Rental company and the rental agreement showed Sukhdev Vaid as the renter of the vehicle.

26.     The driver of the vehicle continued to reposition himself in the Echo Lake Café parking lot. TFOs and other members of the surveillance team observed the driver with a Bluetooth earpiece and observed he was texting on his cell phone. Based on these actions, the surveillance team believed the individual in the white vehicle was one of the suspects in this matter.

27.     At approximately 1:53 p.m., Jack instructed Jane to meet at Swan River School parking lot for the delivery. Jane rode with me in the back seat of my vehicle. While driving to the meet location, Jack told Jane that instead of meeting a black male named, "William," she would meet a white male named "Kurt," who would be driving a white Toyota Rav 4. Special Agent Schrader wore Jane's winter jacket and parked her vehicle in front of Swan River School. Shortly thereafter, a white Rav 4 pulled up alongside Jane's vehicle with a white male inside the vehicle. The white male tried to get the attention of Special Agent Schrader sitting in Jane's vehicle. Law enforcement officers then exited the school and rushed to detain the driver. As this was happening, the man in the white Kia tried to drive away from the scene by leaving the Echo Lake Café parking lot. TFO Chevalier and FBI TFO Jody McLeod were able to block the white Kia on the

highway.  TFO Chevalier detained the driver of the vehicle and then transferred him into the custody of FCSO.

28.     The male driver of the 2022 White Kia K5 sedan was Vaid, an Indian national, with a driver's license showing an address of 3650 Buckley Street, APT 507, Santa Clara, CA 95051.

29.     TFO McLeod secured the Kia and checked for other occupants. Observed in plain sight were three cellular telephones.   One of the cellular telephone's screen was open and displaying a text conversation.  Within the text string (time stamp of 1:34 p.m.) was the following information: a license plate tag "CLZ 4016" and a vehicle description "BLUE CAR" "TOYOTA RAV – 4," both of which describe Jane's personal vehicle.  The time on the text string said 1:34 p.m.  Also shown on the text string at 1:23 p.m. was the question, "What are you wearing," a response of "Black dinner jacket, "Gray slacks," and "Blue hoodie." Also shown on the text string at 1:34 p.m. was the statement, "blue jeans heavy winter coat light gray."  This is the description Jane gave Jack on what she would be wearing during their phone conversation.  The picture below is of the text string.

14



30.    The driver of the white Rav 4 that pulled up next to Special Agent

Schrader was identified as Kurt David Helm, an Uber driver.  Helm showed

investigators the Uber reservation and phone calls he had with a man that contacted

him through Uber.  Helm said was to receive payment to pick up a package from

the man's "aunt" at Swan River School and deliver it to Harvest Foods in Bigfork,

Montana.  Helm had never delivered a package for anyone as part of his Uber

employment, and Helm's "alarm bells went off immediately."  Helm described the

man he talked to on the phone as having a Middle Eastern or Indian accent.  The

customer identified himself as "Sam" and told Helm to look for a vehicle with a

license plate that included "CLZ" and several numbers.  While being detained by officers, Helm stated he was still on the phone with Sam.

31.     On March 5, 2023, FBI Special Agent Trevor Hare drove to the Timbers Motel in Bigfork, Montana, to ask employees if they saw the unidentified subject associated with this investigation.  While at the motel, Special Agent Hare observed an adult black male matching the apparent height, weight, age, facial hair, shoes, jewelry, and body structure of the man photographed by investigators in the Harvest Foods Grocery Store the previous day.

32.     Special Agent Hare arrested the black male based on probable cause of violating the State of Montana Felony Theft statute.  Following the arrest, the man identified himself as Eddly Joseph.  Joseph was then taken into custody by FCSO.

33.     Upon interviewing Timbers Motel employees, Special Agent Hare learned that Joseph's room was booked via booking.com on March 4, 2023, and was booked in Joseph's name.  Joseph checked in at around 5:00 p.m.  When Joseph checked in, he did not have a credit card matching the booking.  Joseph advised his boss's credit card was used to book the room, but his boss had been arrested earlier in the day.  Joseph produced a different credit card to secure the room.  Joseph did not provide a vehicle make or model and stated his vehicle was

towed from Echo Lake Café earlier in the day.  Joseph was given room 112, and

the reservation was for two nights.

34.     On March 6, 2023, FBI Special Agent Hare learned that a "David"

LNU contacted the Timbers Motel and advised he was worried about his friend

staying in Room 112 because this friend had missed a meeting on March 5, 2023.

David LNU wanted to know if the motel knew what happened to him.

35.     Joseph was originally booked to stay at the Timbers Motel for the

evenings of March 4, 2023, and March 5, 2023.  The email address Joseph gave

during check-in was ejosep.503072@guest.booking.com with phone number (203)

564-0799 and address 19 Cecil Street, 30 08 Prudential Tower, Bangkok,

Singapore.

36.     David called from phone number (786) 753-7681 to pay for Joseph's

room, which was rented on a credit card authorization that had not been finalized.

David provided card number 4427 3225 3417 1819, expiring on 02/2028, to pay

for the room.  The name on the card David gave was Anthony Fearon Aladayne,

with a registered address of 2315 Eagles Nest Circle, Decatur, Georgia,

30035.  The phone number registered to David's credit card booking was (352)

283-9386.  David provided an email address of Robbakers0101@gmail.com.

37.     On March 8, 2023, Detective Ryan Stoll executed a State of Montana

search warrant on the 2022 White Kia K5 sedan bearing Montana registration 7-

59115D rented by Vaid.  During the execution of the search warrant, FCSO

Detectives, along with FBI Agents and TFOs, seized Device 1 and Device 2 from

the vehicle.  They also seized a black jacket from the trunk of the vehicle.  The

black jacket, with a light-colored emblem on the left breast, was found in a white

plastic shopping bag in the trunk of the sedan.  FBI Special Agent Furda

recognized the jacket as visually similar to the jacket Joseph was wearing in

security camera video from February 25, 2023.   Two pictures taken of the jacket

collected from the White Kia and a screen-shot of the security camera video from

the Cennex gas station located on Hwy 83, Bigfork on February 25, 2023, are

included below:

///

///

///

///

///

///

///

///



38.     On March 6, 2023, FBI TFO Jody McLeod and I meet with Jane.

TFO Jody McLeod showed the following photo to Jane:



39.     Jane identified the person depicted in the photo as the male who took

her money in the Echo Lake Café parking lot on February 25, 2023.

40.     On March 6, 2023, FBI Agent Schrader met with Evalani Dahlin,

Assistant Branch Rental Manager, Enterprise Rent-a-Car at the Missoula

International Airport.  Dahlin advised Sukhdev Vaid rented a vehicle from

Enterprise on February 25, 2023.  Vaid provided the rental car company an address

of 3650 Buckley, Apt 507, Santa Clara, CA 95051, telephone number (669) 204-

8308, email address vaidsukhbev456@gmail.com, and California Driver's License

#Y9759925.  The rental pick-up was on February 25, 2023, at 12:07 p.m. from

MSO (Missoula Airport) and the rental vehicle was returned February 26, 2023, at

10:02 p.m. to SFO (San Francisco Airport). The vehicle rented was a 2022 Chrysler Pacifica (Black) with Missouri license plate EH7Y4C.

41.    Based on the above information, I submit that Vaid and Joseph conspired with others to travel to Montana and defraud Jane, in violation of 18 U.S.C. § 18 U.S.C. §§ 1343, 1349 (wire fraud and conspiracy to commit wire fraud) and 18 U.S.C. § 2314 (interstate transportation of stolen property). I submit evidence of these violations will be found in the Devices. I base this on the following:

    a. Based on my training and experience, criminals involved in setting up a meeting with a victim to pick up cash as shown in the affidavit will communicate by text message, or through a tablet, with co-conspirators and with the victim over the Internet and by telephone, including interstate wires and overseas. I know in my training and experience that tablets and USB devices are used to store large amounts of information in fraud rings, including victim information, account information, and other necessary documents to perpetuation the fraud. These storage devices are especially helpful when co-conspirators are travelling large distances because it limits the amount of material the defendant must carry.

21

b. Based on my training and experience, I know that fraud schemes that abuse the elderly will immediately transport the money out of state to avoid detection and ensure the victim cannot recoup the funds.

## TECHNICAL TERMS

42.     Based on my training and experience, I use the following technical terms to convey the following meanings:  Wireless Telephone, cellular phone, or smartphone:  A wireless telephone (or smartphone, mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet using a browser or other applications.  Wireless

telephones may also include global positioning system ("GPS") technology for determining location of the device.

43.    Based on my training, experience, and research, I know that the devices have the capabilities to store digital photographs and evidence, documents used to perpetuate the fraud, location data, and communications with victims. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed the device, and the criminal activity associated with those devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

44.    Based on my knowledge, training and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools even if the information is deleted.

45.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate, not only electronically stored information that might serve as direct evidence of crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic evidence might be on the Devices because:

a.      Data on storage medium can provide evidence of a file that was once on the storage medium, but has since been deleted or edited, or of a deleted portion of a file.

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

24

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## CONCLUSION

46.     Based on the forgoing, I request that the Court issue the proposed search warrant.  I believe there is probable cause to conclude that the Devices, including a Samsung Tablet with grey cover (Device 1); and a FedEx USB storage device with attached key (Device 2), which were seized during the investigation and known to be utilized by Sukhdev Vaid and Eddly Joseph, contain evidence showing they are working with Jack Chen and other unidentified co-conspirators to fraudulently steal money from Jane Doe and possibly others.

47.     It is my belief that there is probable cause to believe that a search of the items described in Attachment A will provide other evidence of crimes, including, but not limited to, fraudulent misstatements, the falsification of documents, the disposition of fraudulently obtained funds, and discussions between co-conspirators regarding travel plans to Montana to illegally obtain cash from Jane Doe through fraudulent means.

///

///

25

DATED this _25_ day of April, 2023.

Respectfully submitted,

/s/ Jason D. Grende

Jason D. Grende
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to on the phone under Fed. R. Crim. P. 4.1.

Kathleen L. DeSoto
United States Magistrate Judge

26